Case number 19-7157, Service Employees International Union Local 32BJ v. Preeminent Protective Services, Inc., Abellant. Ms. Gaines for the Abellant, Mr. Anderson for the Appellee. Good morning, Ms. Gaines. Good morning, your honors. Please proceed. May it please the court, my name is Eden Brown Gaines and I'm advocating on behalf of Preeminent Protective Services, Incorporated, one of the many small minority-owned businesses in the District of Columbia which serves the city and employs a number of the city's citizens. I think this case illustrates some of the concerns that are inherent with very large and very powerful unions and some of the flaws that can be inherent in the arbitration process. While unions certainly serve an abusive, I think while the arbitration process can play a critical role in reducing the backlog of court cases and assisting parties and expediently resolving conflicts, I think this case illustrates part of the issues with the arbitrator's desire to ensure income and making that focus the primary focus of the process rather than the merits of the actual issue. Before we get to the merits here, there have been some substantial questions raised about jurisdiction, so can you walk us through why you think that the order compelling arbitration and the contempt order are before us? Because you didn't appeal those orders within the 30-day time period. Sure. The District Court assumed jurisdiction pursuant to the Federal Arbitration Act, and under the Act, section 9 U.S.C. section 16b, an appeal may not be taken from an interlocutory order under the Act directing arbitration to proceed, and so Preeminent was not in a position to appeal the court's order directing that it go to arbitration at the time the court entered the order. Except that Greentree says that an order like that is not interlocutory under B-4, it's final under A-3. Well, I don't think that the order directing them to arbitration just under the plain language of the Federal Arbitration Act statute would have been directly appealable at that time. I mean, typically when the order ensues, the parties must be directed to go to arbitration, and then at the close of the case, when the case is finally dissolved or disposed of by the court, then at that time the parties are in a position to be able to appeal whether or not the order... How is this order compelling arbitration different from the one that was held to be final and appealable in the Greentree case? Because in this case, the court retained jurisdiction and continued to exercise its authority throughout this proceeding. If the court recognizes the fact that when... How do you get that? If you look at the arbitration order, he just grants summary judgment and compels arbitration, and the order on its face just grants summary judgments, it seems like the district court was dissociating himself from the case. I mean, I think we can look into what occurred after the judge's order to direct the parties to arbitration. I mean, the case was not closed by the court, the appellees were able to file a motion for contempt of that order, and the proceedings continued as if it was the same case, not the reopening of a new case, not in the posture of a case that had been closed in an order being revisited. And so, I mean, I think this case falls within the context of an interlocutory order under the Federal Arbitration Act statute, meaning that preeminent would not have been in a position. If we had filed an appeal at that time, then the court would not have had jurisdiction and we would have been sent back to go through the proceedings until the case was finally concluded. Would you also like me to address the issue with respect to the civil contempt order? Yes, please. With respect to that, the course of health of the civil contempt order is not typically deemed interlocutory and thus not appealable. This district has generally taken that position, and then there's a well-entrenched Supreme Court case law that essentially stays the same, and it describes the rule as well-settled. And so, again, this... Your case for the contempt order being interlocutory seems very intuitive to me. There are sanctioned... There are attorney's fees issues that are still pending, and the contempt order looks conditional on its face, but we have Budinich, which seems to tell us that the pendency of fee issues doesn't defeat finality. And we have a case from our court called Armstrong, which says that if an order is conditional in the sense of it says, here's what you have to pay unless you cure a contempt, we said that was a final contempt order. So how do you get around Budinich and Armstrong? Well, I think this case is a little different because the court did not say, here's what you have to pay when initially issuing the order of civil contempt. The court finally said, here's what you have to pay. And it would just kind of... It would be nonsensical in the sense that preeminence arguments concerning the propriety of the sanction, meaning whether or not it was punitive in nature, meaning that it should be treated like civil contempt, whether or not they had the ability to pay it, all of those arguments aren't ripe, actually, until the parties know what the actual sanction is going to be. And so it was conditional contempt, meaning that if preeminent didn't take some act in the future, then the court would take certain acts. And those acts didn't happen when the court initially entered the civil contempt order. And then, of course, we didn't know what the court was going to order preeminent to pay finally until November, and then preeminent appealed that order within 30 days. Ms. Gaines, if I could ask you a question about the order. So there's a conditional contempt order. It seems that the district court's order of that date does two separate things. It imposes a conditional contempt on preeminent, right, which actually gets purged, right, because preeminent does arbitrate within one month of that order, right? So preeminent is actually never held in contempt. But I think that order does also a separate thing, which is impose attorney's fees irrespective of the contempt, right? I mean, the attorney's fees at that point are not connected to the contempt. It's sort of, you know, the contempt is purged, but the attorney's fees continue, right? So it seems if you think of the order as doing those two distinct things, then the order saying that there will be attorney's fees, you know, is final and appealable as of the June order, because it's a determination, a final determination that there will be attorney's fees awarded, and the only thing left is to figure out the amount. Well, let me answer that in two ways with the court's indulgence. The first issue was that there was some difficulty in determining exactly what it is the court was doing. If the court recalls from the record, the court actually, I believe in the first hearing, the court said, I'm not going to hold you in contempt at this point. And then, you know, more things happen, we get to the court in January. And then the court says, I'm going to order attorney's fees, but isn't clear under what authority the court is making that order in January, because that the court doesn't actually make a contempt finding. And so there's this question as to whether the award of fees at that time was pursuant to the court's inherent authority, you know, some statutory mechanism. And so we've raised that issue in the brief. And I think it was the responsibility of the court to be clear under which method, whether it be contempt or pursuant to contempt proceedings or the court's inherent authority as to how, you know, these attorney's fees awards were going to be issued. But then to answer your the second part of your question, again, it's I think it's what I'm saying earlier about how this award is manifested. Preeminent would not have been able to appeal the issues with the contempt award, meaning whether this award was punitive or compensatory in nature, none of those things were readily apparent until the final amount of the award was in place. And so preeminence concerns, obviously, were with the fact of the and the court wasn't very clear on how it was issuing this award, because as you've correctly noted, preeminent was found in civil contempt by the order. But obviously, they were able to, it was conditional, and they were able to meet the conditions, you know, that the court had imposed by going to arbitration. But the rest of the aspect of the order was still kind of in the air until the court actually heard the party's positions and then entered. Is it in the air, though, under Budenich and Armstrong, as Judge Katz has had mentioned, though, because those cases do seem to suggest that when there's an order, saying that there shall be the payment of attorney's fees, that is a final and appealable order. But I think I think it's just Katz has pointed out, it said what the the party would pay. And in this case, it was broken out, there wasn't quite the determination as to what the party would actually pay. You're right about that. But the order that we held to be final, in Armstrong, it was a coercive civil contempt, like this one. And it said, it said to the executive office of the president that you will be sanctioned x dollars per day, unless you purge the contempt by coming into compliance by some future date certain. And sounds awfully contingent to me, but we said it was final. Well, there are two parts to our order, though, that's a little different than what you describe. Yes, the court here did say you'll pay x dollars per day unless you do something in the future. But then the court also said, you're going to pay x dollars for some unknown amount to be determined. Because of on the fees, that's right, your contempt or you know, the it's hard to tell from the court's orders, whether the attorney's fees is a is a penalty under contempt, or it's, you know, the court's inherent authority to supervise, you know, it's, it's, it's orders, like whether they whether the judge issued this attorney's fees amount by its inherent authority, or whether it was pursuant to the contempt. But in either case, this is a little Miss Gaines, the order does say that, that the fees are to the order says to compensate the plaintiff for the defendant's contemptuous and dilatory tactics, and regardless of any subsequent purgation of the defendant's contempt, which seems to me to, to decouple the contempt from the attorney's fees, right. So even if you were to purge the contempt, the court is making clear that there will be attorney's fees awarded. It's still tied your honor back to what happened in January, because if the court recalls the court, the district court actually said in January that you're going to have to pay attorney's fees required the parties to put in petitions, and didn't say exactly what those fees would be. And so then when we move forward to the point where the court is issuing this, the conditional contempt order, it's also bootstrapping in the conduct, the attorney's fees, everything that had occurred, at least from January, going forward to the future. And so it just isn't at the point of making the statement that you're in civil contempt, the court initially just said, hey, I'm going to make you pay these attorney's fees, because I don't like what you did, or, you know, you're kind of in contempt. And then the court moved forward after the arbitration broke. I'm No, I just. Okay, go ahead. I'm sorry. No, no, it's okay. After the court after after the arbitration broke down with arbitrator Johnson, then the court moves forward to say that this is a condition conditional attempt order and states the issue, as you've said it again. Go ahead. The attorney's fees, it's no problem. You're right. I got it. The attorney's fees is tied to the court's concern, I suppose, for lack of a better word, with its belief that preeminent had failed to follow its orders, whether by the letter and spirit and moving forward. You know, to proceed to arbitration. So I mean, I think that I think the court has jurisdiction, because I think both orders were of the nature that had preeminent appealed the first order when it occurred, this court would have said, we don't have jurisdiction, we're going to send you back because of the Federal Arbitration Act. And I think had we appealed the contempt order before the attorney's fees had been known, not only would preeminent, you know, have been in a position where they couldn't have made the arguments because they wouldn't have existed yet they wouldn't have known what the fee was going to be and what the problems are going to be. In fact, again, preeminence argument is that this isn't even civil contempt. Let me ask you about your, your understanding of the FAA, the order to arbitrate is final unless stayed under the FAA. Yes, sir. So, so the wasn't stayed here. That's correct. That's correct. So it's final. It's interlocutory in the under the FAA, it's final unless stayed. I don't know that I read the language of the FAA in that way. I mean, it's simply just as an appeal may not be taken from an interlocutory or under order directing arbitration to proceed. And I'm not sure that the statute speaks to whether or not the parties requested or the judge decided to stay the order. I mean, I think preeminent did have to continue to arbitration based on the court's directive and then await the final conclusion, whether the arbitration award was confirmed or whether it was vacated or altered in some way pursuant to the statute before it can ultimately appeal the court's decision. And I think that is actually what ultimately did and in so doing that this court is able to take jurisdiction over the matter. Can I just ask you one question on the merits, if we were to reach them about the arbitrability question? The collective bargaining agreement that includes the arbitration clause is between preeminent and the union, right? Yes, right. Not between the individual employees, right? A collective bargaining agreement is by definition between preeminent and the union. Yes. Yes. Yes. I think the problem with the collective bargaining agreement in this instance was whether this was the applicable collective bargaining agreement. So I think the issue that ultimately had to be determined was whether you could grieve or go to arbitration on a termination grievance. I think the issue was whose collective bargaining agreement was applicable because preeminent's argument is that it was not the employer of the grievance. Preeminent couldn't even say, other than reading emails that it received from the District of Columbia, why the grievance had even been terminated. And ultimately when the arbitration went forth, the grievance testified that they'd never been terminated by a preeminent, that it hadn't been communicated by them. So that fundamental issue was just that whether it was the district court to determine it, and it's preeminent's position that that was the responsibility of the district court, rather than the arbitrator, because this was not an issue of whether the parties were arbitrating a proper grievance or whether it was an interpretation of the collective bargaining agreement, but instead it was the very issue of whether the contract even applied, whether this the appropriate mechanism to be able to force the parties into arbitration. Even the arbitrator, the initial arbitrator, believed that as well. And that's why he stopped the arbitration and dismissed it, because he believed there was a jurisdictional question that actually should have been resolved by the district court. And in this case, the district court thought the other way. The parties proceeded to arbitration because they were following the district court's orders. And ultimately, we're here because that overall issue from the beginning needs to be looked at, too. But I think more importantly, even if the court didn't feel that it could take jurisdiction or discuss whether or not the district court should have made the ultimate determination, I think in looking at the contempt order, I think this case still has to be reversed, because the law is very clear that a contempt order has to be very specific. It's got to tell a party what they should and shouldn't do. And there just isn't any evidence in this record that suggests that preeminent, whether actually or even in spirit, was in contempt of the district court's order. Preeminent went to arbitration each time. I don't think that saying that a second separate agreement wasn't necessary as consummation conduct. I think the court did, in fact, order preeminent to pay the fees, but we just kind of never got to that issue. It took a long time to even get to the decision as to whether preeminent was the appropriate employer. So there's just never any evidence of a bill that wasn't paid or an arbitration fee that was due or owed by preeminent that didn't occur. We didn't get to it until ultimately the parties went to final arbitration, and then the arbitrator made ultimately a determination in preeminent's favor, and at that time he sent an invoice, as is the usual process, and based on the court's orders, preeminent paid that invoice. And just to speak really quickly to the issue of just the attorney's fees in general, and I think this is very important for the court as well, and it highlights the punitive nature of the sanction rather than the compensatory nature. A civil contempt order is supposed to be compensatory in nature. It's supposed to compensate or repay or make whole a party for what they lost. And in this case, we never even received a bill in the record demonstrating what the union actually paid for the conduct that the court considered consummatious or against its orders. And the only evidence submitted in the record was the evidence of the market rate by another union official who said what the typical rate in the Washington metropolitan area should be. So the fees that the court awarded far exceeded what is typical in the market rate, which the law says the court must consider. And it's a very long line of cases involving fee-shifting statutes which allow use of market rates to USC 1988, for instance. There's no suggestion in any of those cases that a market-based fee award is a criminal sanction. Well, our argument... I'm sorry. Those awards are routinely applied through civil processes. So the point here, Your Honor, is that it wasn't a market-based sanction. There was an affidavit that preeminent submitted again by a union official that stated what the market rate or the range for the market rate was in the Washington metropolitan area. That was the record of the market rate. And it was about $200 less than what the union was relying on for fees. They used the Laffey Matrix. And I think it was the U.S. Attorney's Laffey Matrix. Which is some attempt to approximate market rate. Well, we cited... In your theory, as I understand it, is the outer bound of the sanction has to be not the market rate, but what the union actually paid in legal services. Yes, sir. The reason you say that is if you go up to market rates, that makes the sanction... That makes the fee award criminal in nature. Not quite. Yes, absolutely, on the point that it wasn't what the union actually paid, but not with respect to going up to market rate. Because in this case, we didn't just go up to market rate, we exceeded the market rate. We went well and above the market rate. So yes, the premise is, is that it has to be compensatory in nature. And it really just should have been what the union paid, absolutely. But even if the court were to contemplate that the market rate was a fair rate and it was reasonable, this wasn't a market rate case. This was a case where the Laffey Matrix was applied. And we cited case in the brief that this court has determined that the Laffey Matrix isn't applicable to every circumstance. Isn't the assumption here that the union counsel is the equivalent of a public interest attorney who can claim market rate? Isn't that what was going on? No, that's not what happened. Even if the court were to determine that based on the union service as kind of a public interest attorney, that they could claim market rate, they didn't claim the was 250 or 200 to $350 an hour. They received a rate that was about $220 in excess of that. And the Laffey Matrix is not the market rate. So that's the other part of preeminence argument that the court applied the Laffey Matrix. There's case law in the circuit that says that that isn't the market rate for these kinds of cases. And then again- When you say these kinds of cases, what do you mean? A union case. The Laffey Matrix in this circuit is applicable to employment discrimination cases. And then the court has a body of case law that just speaks to the rate being something that is commensurate with the work in the industry, the level of experience, et cetera. Is there some specific case you have in mind that says a union rate can't be the Laffey rate or can't be the market rate? I'm not- The case doesn't say, I'm sorry, your honor. I could go to it if I could look at my brief, I'm afraid I'm going to make the Zoom drop all. But we cited to the case in the brief and the case actually says that the Laffey Matrix is for employment discrimination. It's not cast in the way that you just stated it, that it cannot be used for union cases, but it says specifically it's for the employment discrimination. And it has another statement that gives kind of like a generalization for cases. But I believe here the market rate is determined by the other body of case law that we cited in the brief from the DC circuit that speaks to the prevailing market rate for the industry, the attorney's level of experience, et cetera. And again, the only information that's even in the record is what preeminent presented from another disinterested union official that basically said what the market rate is for attorney's fees gave a range in this area. So the fact that the fees awarded in this case exceeded even the market rate makes it even more clear that this sanction was more punitive in nature rather than compensatory, and that of course preeminent wasn't afforded the protections that are inherent when issuing a punitive or criminal-like contempt sanction. I thought the Laffey Index was a device for estimating market rates. I wish I could do that in every case because it would be quite a bit at this point. But no, it isn't. The case that we cited in the brief makes plain that the Laffey matrix isn't necessarily the benchmark for determining the market rate. And I think inherent in that, when they speak to employment discrimination cases, I think that the courts are probably considering just how you get to a certain point. Employment discrimination cases are typically contingency based cases, the risk that is inherent in the case. If you look at the regular Laffey matrix in D.C., an attorney for 20 years is about $890. In the U.S. attorneys matrix, it's closer to $700. So that's based on risk, etc. In this case, we know what the market rate is for union attorneys because there's an affidavit in the record that says what the market rate is for union attorneys, and it was essentially undisputed. And so when you say union attorneys, do you mean just the in-house counsel or do you mean the outside lawyers as well, the law firm as well? The outside lawyers. The evidence that we submitted spoke to outside lawyers. I mean, I think there is case law that supports the concept that in-house counsel, that they're ours if they keep them accurately and in the manner and way that the courts typically acknowledge that they can recover for some of the work they do despite the fact that they're salaried and they're paid in-house. But this is the prevailing rate for outside counsel. And just as the court has acknowledged, union attorneys are often considered a public interest attorney. The rates are typically reduced. But again, because of the nature and the clear case law and civil contempt that it must be compensatory, meaning it's just got to basically be what you paid, what you lost. There really isn't supposed to be a windfall or that can convert it to a criminal. That's an argument about civil contempt being different from fee-shifting statutes. I'm having trouble understanding your argument about why union counsel as opposed to company counsel or somebody else should be treated differently. Well, I wouldn't focus on who it is. I would focus on the industry, the work that's being done. I mean, you can have the same attorney take on a case on behalf of a union and perhaps do a merger acquisition and the rates could be different because of the nature of the case. But the market for work within the industry, grievances, determinations of collective bargaining agreements, arbitrations, that kind of work has a certain market rate that unions, when they seek counsel, typically outside counsel, pay in the Washington metropolitan area. And it isn't the Lafayette matrix. There's evidence that unions aren't paying what the rates are in the Lafayette matrix. I suppose if the union had put on evidence that this is what the Washington metropolitan area requires for unions, then we'd be having a different conversation, but they didn't do that. The only evidence in the record is actually just the affidavit that says that this is what unions typically pay for this kind of work in the arbitration context. And that is what the court is supposed to look to. And then I can't see my time, but just to briefly mention, another just concern for my client is the court kind of ignoring the evidence about preeminence ability to pay. Because this could turn into a situation where you have business officials being jailed or held in contempt when they absolutely don't have the means or the ability to purge themselves of it. And obviously contempt should be something that someone can pay in order to deter, you know, and effectively administer. Isn't it your burden, if you want the sanction reduced based on inability to pay, I would think it's your burden to show that. Yes, sir. I believe that's true. District court didn't ignore the evidence, looked at the evidence and found that you hadn't discharged your burden. I mean, I think the court's review of the evidence was erroneous. I mean, preeminent put in their financial statements that showed a clear loss. This preeminent demonstrated that they were no longer a contractor on the DC citywide contract, and that that was 90% of their revenue as a company. They also showed that they had been the victim of fraud and that they had lost $750,000 and that this was an issue that was actually being prosecuted by the US Attorney's Office in the Eastern District of Virginia. They showed that they had a negative income position. So I mean, So your position is that his finding on that point is clearly erroneous? Yes, sir. Based on the evidence that was presented in the record. Judge Rao, any other questions? Judge Edwards? No. Thank you, Ms. Gaines. Thank you. Mr. Anderson. Good morning, and may it please the court, I'm Michael Anderson from the East Service Employees Local 32BJ. I'd like to begin with the appellate finality questions here. The May 9th, 2018 order compelling arbitration was a final order under the FAA 9 U.S.C. Section 16A.3, and Judge Katchis is correct that the Greentree case qualifies an order like that as a final and appealable order. This was not a case where the union brought multiple causes of action, where the arbitration only went to one of the claims, where there were other non-arbitrable claims that were awaiting final judgment. In this case, the order compelling arbitration was the sole relief the union sought in this petition, so that the district court's order granting summary judgment on the only merits claim and granting the only relief the union sought was final and appealable. What would fall under 16B4, which says that an order directing arbitration to proceed under A4, which is the provision, sorry, under Section 4 of the FAA, which is the provision we're talking about here, is interlocutory? True, because that's in the context of there being other claims in the mix which had not reached final judgment. But as the Supreme Court held in Greentree, if the only relief the plaintiff is asking for is an order compelling arbitration, then that's a final appealable order, and the losing party doesn't get to claim that the finality is somehow postponed until the arbitration is complete. And then what do we do with the fact that while the order compelling arbitration seems final in the way you describe, the district court didn't close the docket on 17-16-79, and when all of and contempt issues came up, they picked up in the same case rather than in a different enforcement case? Because all district courts continue to have jurisdiction to enforce final orders through contempt proceedings. So, for example, if a preeminent had brought a timely appeal immediately after the May 2018 order, the union would not have prevailed on a motion to dismiss the appeal just based on the argument that there might be some future noncompliance with the order that might trigger further orders to show cause and contempt applications. A district court's inherent power to enforce its own final orders through contempt proceedings does not detract from the finality of the underlying order. If it did, then parties in contempt proceedings would always be able to circle back and tell the appellate court, well, we shouldn't have been enjoined in the first place. And that's what's clear that parties in contempt proceedings are not allowed to do. Okay, what about the contempt order? The contempt order, the distinction that matters for purposes of the court's decision here is between pre-judgment civil contempt orders, which are interlocutory and are governed by the final judgment rule, versus post-judgment orders. That's the distinction that shows up in the cases that the parties have cited in competing briefs. In the cases cited in the preeminent reply brief, Byrd v. Reno and Machinist v. Eastern Airlines, the contempt orders had issued prior to a final judgment on the merits of litigation. In Byrd, it was a discovery order, compelling production of audio tapes in a Title VII action. In Machinist, it was contempt of a preliminary injunction, even as the parties continue to amend the complaint and proceed to a final judgment on the underlying merits. In this case, however, if I've persuaded the court that the May 9, 2018 order was a final appealable order on the merits, the subsequent contempt citations are post-judgment civil contempt orders. And that brings them within the scope of Armstrong and Gwynn, the two DC circuit cases I cited in the briefs. And there's a long string of appellate authority that draws this distinction. It explains that post-judgment contempt orders are immediately appealable because they don't raise the kind of problems under section 1291 about final judgments that would occur if they occurred prior to the final judgment on the merits. So for that reason, preeminent, if they were aggrieved by Judge McFadden's findings in the June 9, 2019 civil contempt order, they had 30 days to bring that to the court. Because they didn't, they are no longer in a position to say, we shouldn't have to pay these fees because we weren't in contempt to begin with. This court said in Gwynn, that is also, you know, that is also what other courts, for instance, the Sixth Circuit in Genises versus Green have said. I didn't hear what you asked, Judge Katz. Sorry, go ahead. No, did you ask something I didn't hear? Yeah, it just seems very odd to me that for a civil sanction like this post-judgment, but a coercive sanction which says it'll be 20,000 unless you cure the contempt by such and such date, and then 20,000 every two weeks thereafter. Baked into that is a need for future proceedings to figure out whether the contempt was purged and how much the sanction should be. So you're positing one appeal of the order imposing the sanction on the front end and then a separate appeal on the back end when the district court says, well, the contempt wasn't purged in time and, you know, it was purged in the second week after. So the sanction is $40,000 as opposed to 20 or 60, and that's a separate appeal. It just seems very strange. I understand, Your Honor, but that's really an argument against this court's decision in Armstrong. And in the attorney's fees context, that's also an argument against the Supreme Court. When the Supreme Court says that the fixing of the amount of the attorney's fees does not affect the finality of the underlying order, the Supreme Court really is making a choice that sets up the need for two separate appeals. The first appeal from the order that awards the attorney's fees and the second order that fixes the amount. But that's inherent. Yes. I can't figure out a way around Armstrong, but let me take a crack at Budinich, which is to say that case holds that the fee issues are collateral to the merits issues. Here the merits issues are the order compelling arbitration and we're having this conversation on the assumption that you've we're talking about everything that flows from non-compliance. Correct. And the question here is whether one set of consequences, which are attorney's fees, are collateral not to the merits but to the contempt. And you can think of the contempt and the fees as just everything bad that might happen to a party because it disobeyed a judicial order. That's a little bit different from Budinich, which is fees are collateral to merits. Except that Budinich was trying to resolve a circuit split where many courts follow the line of reasoning that you're proposing now and made delicate distinctions between fee orders which were like damages versus fee orders which were like costs. And they apply different rules of finality to each one. Budinich takes a very broad brush approach and says no matter what the statutory or equitable or contractual basis of the fees, litigation over the amount of fees does not toll the finality of the underlying order. And that applies just as much to contempt as any other case. When I mentioned the Sixth Circuit's decision in Genesis versus Green, which is cited throughout in my brief, although that was a Sixth Circuit case, it was actually written by our late District Judge Oberdorfer, who was sitting by designation in the Sixth Circuit, to make the opinion any more binding on this court. But his analysis of how attorney fees in contempt sanctions work in relation to Budinich is persuasive and correct. And I would urge the court to follow Judge Oberdorfer's analysis in Genesis. So what that means is that if preeminent believed that it had not in fact been in contempt of Judge McFadden's May 9th, 2018 order, it had 30 days to bring an appeal where he could raise all of its arguments about how everything that it did in the 13 months between the arbitration order and the contempt order was not in fact consummatious. But if that 30-day period elapses without an appeal, then the court simply doesn't have jurisdiction to use fee litigation to circle back and say, well, we don't think preeminent should have to pay any fees because they weren't in contempt to begin with. That is what preeminent is urging you to do. And that's contrary to the finality rules that are set forth in cases like Genesis, as well as U.S. v. Gwinn. If I may turn to the merits of the amount of the fees, unless the court has further questions? All right. Okay. It's a bit frustrating to hear preeminent argue even now that there is a D.C. Circuit decision that says that the Laffey matrix is not applicable where the litigation occurs in some sub-corporate market, like union rates. Because the only citation that's given for that is on page 26 of the appellant's opening brief. And it reads, Covington v. District of Columbia, 57 F. 3rd, 1101 at 1113. But when you look that side up, you find that that is a citation to Judge Henderson's dissent in that case. And that was in fact the very proposition that the majority in Covington, written by Judge Edwards, rejected, saying that the Laffey rates state the prevailing market rate, and there are no second-class markets within the legal community. And that's particularly true when it comes to union lawyers. As the record reflects, my partner Arliss Stevens and I have, you know, good credentials as anybody that works for large firms that serve wealthy clients. I'm a 1987 honors graduate of Harvard Law School. It is true that I and Arliss Stevens bill our clients, our union clients, at less than the full Laffey rates. But the entire premise of the lodestar jurisprudence, both in this court and in the Supreme Court, is that the prevailing hourly rates within the market, and in the District of Columbia that's defined by Laffey, apply whether I'm a pro bono counsel for a legal aid clinic or simply an ideologically motivated public interest lawyer who works for workers and workers of workers organizations. Can I ask you, can I ask a different argument, which is why should we extend those, those are all cases involving fee shifting statutes. Congress gives the courts authority to figure out what is a reasonable rate and the existence of the fee shifting statute is thought to reflect Congress's inducement to have talented lawyers like yourself bring cases that otherwise wouldn't be brought because they want private enforcement in some area. All of that is fine, but this is contempt. There is no fee shifting statute, so the background rule would be the American rule that each side bears its own fees. The only exception to that is inherent power, which is to be cautiously exercised. And we have the Supreme Court in Goodyear telling us that if the sanction is an award of fees, it has to be precisely to compensate the client for the amount it was forced to pay because of the contemptuous conduct. And here, whatever your motives for lowering your rates to your client, the injury to your client is what they had to pay because of the contemptuous conduct on the other side. Understood, but even one of the earliest Supreme Court decisions on the Lodestar, Pennsylvania versus Delaware Valley, was a contempt case where they approved the Lodestar in a contempt context. What's more, the argument that you're sketching here is effectively no different than the argument that the losing defendants made in Save Our Cumberland Mountains and in Covington. The argument is that, well, even under ordinary fee shifting statutes, all the client is entitled to is an award of their attorney's fees. And if they didn't actually have to pay any attorney's fees because they had a pro bono counsel or had discounted fees because they had a public-spirited counsel like myself, then it would become punitive damages. It would exceed the compensatory intent of the fee shifting statute to allow the plaintiff to recover something in excess of the actual rates. Well, but the question my colleague is asking, in Cumberland, was there a fee shifting statute? There is no fee shifting statute here. Um, no, that follows from the power to award civil contempt, correct? Right. But I mean, that's the whole point. I mean, the premise of his question is, in those circumstances where there are fee shifting statutes, we do what, I think, what, wasn't Cumberland a fee shifting statute? Yes. I believe it was Section 1988. Yeah. So, I mean, so you're not really answering his question. His question is, is there any case law that says, you said there's an old Supreme Court case, which I'm not aware of, I'm not saying it's not there, but that hasn't been normally, our normal routine is to apply fee shifting statutes and to follow the Laffey matrix. That's true. But has that been done in situations like this? In my brief, I cited a long line of federal cases that apply the lodestar rates in contempt and in rule 37 sanctions cases where the same considerations would apply. I looked and found district court cases, but no court of appeals cases. I'll take a look at Delaware Valley. I missed Delaware Valley. I'll take a look at that. But you know, court of appeals cases. The everyone, all the cases that the parties. Yeah, there was, there's the Teledyne technologies case on page 34 of my brief. Tell the court that's a federal appendix case. It was not published. Okay. But that's where the seventh circuit, at least in a, in a federal appendix case, apply the lodestar. Is Barrow consistent with what you, Barrow v. Falk? I just don't remember. I'm sorry. I don't have that in front of me, your honor. All right. I'll have to look at that again. Okay. Any, anything else you want to tell us about? Ability to pay or things we haven't covered? Oh, well on inability to pay, I, the, the district court had a full evidentiary record from which it discredited a preeminent claim of inability to pay. It preeminent has not even provided you with any of the exhibits on either side in the exits of record. If you need to go back into the, into the ECF dockets to see, you'll see that the district court had ample reason to judge from what preeminent said on its own website, that it has revenues of $25 million a year, that, that it always meets all of its financial obligations. So that a $50,000, $51,000 fee award does not seem to be outside the ability to pay. And finally, I think that to the extent the court is interested in the question, take a look at judge Easterbrook's analysis for the seventh circuit, where he says that it, it, it is a circumvention of the bankruptcy code for courts to give ad hoc debt relief because one party claims insolvency where all other creditors are not also brought into the process. If preeminent genuinely can't pay, it has a remedy under the bankruptcy code. And then the bankruptcy court can allocate who, you know, who's entitled to what percentage of, of its obligations, but to ask for a one-sided debt relief against only one creditor in a non-bankruptcy proceeding effectively frustrates what Congress expects in the bankruptcy code. And that's persuasive. And I have nothing further unless the court has more. Judge Rao? Judge Edwards? No, I'm fine. Okay. Thank you, Mr. Anderson. Ms. Gaines, we'll give you two minutes. Yes, sir. I mean, I think it's just important maybe to go backwards so that the court can see that there is something to do here. I mean, if we just go from the award of attorney's fees and the arguments concerning the attorney's fees, the court certainly has jurisdiction to determine whether the fee was proper, whether it came in the right context, because that didn't come until November. And this case was appealed within 30 days of that particular award. And then moving backwards to the civil conditional civil contempt award, the court has to consider the fact that because it was conditional, the court still had to do something after entering that order. It had to say, you didn't do what you were supposed to do, and here's what we're going to do, or you did do what you were supposed to do, and here's what we're going to do. And the court really didn't do that until November. And so this court has jurisdiction certainly over those issues. And then moving back to just the issue about compelling arbitration, 16b says that an interlocutory order is not appealable if it's this type of order. And then the court is wondering how this is interlocutory. I think we just have to look to what happened. Again, the court, it says that the case has to be disposed of, the case has to be dismissed, and the court did not do that. The court continued to exercise its jurisdiction in the very same case, you know, as the parties proceeded. With respect to the arguments about ability to pay, I think there was just a conflation of when something is reduced to a judgment versus when it comes in the court's exercise of its inherent authority to have compliance with its orders or contempt. Had it been reduced to a judgment, then perhaps, of course, preeminent could dispose of it through a traditional debt-related proceeding. But this is a contempt award. So if preeminent can't pay the order, then again, its officials can be jailed until they actually, it becomes like a debtor's prison in that way, until they satisfy, you know, the court. So whether or not you can purge yourself of the contempt is an important consideration and factor. And I think financial statements are more important than what's stated on an outdated website. And preeminent certainly put in its actual financial statements. They're in the record because they were under trade secret aspect of those statements that showed that preeminent actually did not have the money in order to do it. And then another thing, if there really was an issue based on what was that issue, the court should have held a hearing. The court did not allow preeminent the opportunity to have an evidentiary hearing where, you know, they sent in an affidavit, they sent in their financial statements, but where there could be this, you know, competition of whether the internet site was important versus their actual financial statements. So I mean, I think this is a different context. It's not a debt. It's not something that can be discharged in bankruptcy. It's the court requiring, you know, and in fact, the appellees actually filed a subsequent order asking for again, contempt for preeminent not paying before the bond was put up in this case, because before the PPP, preeminent didn't even have the money to put up the bond. And so I think we're just in a different context. Thank you, Ms. Gaines. Do my colleagues have anything else? Okay, thank you. Nice meeting you all. Thank you.
judges: Katsas, Rao, Edwards